UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

HEIDI GILL,                                )
                                           )        Case No.: 4:08-CV-01839
            Plaintiff,                     )
                                           )
      v.                                   )        JUDGE DONALD C. NUGENT
                                           )
RICHARD KOVACH, et al.,                    )        MEMORANDUM OPINION
                                           )        AND ORDER
            Defendants.                    )
                                           )
                                           )


      Heidi Gill ("Ms. Gill") filed the complaint in this matter on July 31, 2008, raising claims against

Officer Richard Kovach ("Officer Kovach"), the City of Warren (the "City"), Warren Chief of Police

John Mandopoulos ("Chief Mandopoulos"), and Warren Public Service and Safety Director William D.

Franklin ("Mr. Franklin") for violations of her Fourth Amendment rights pursuant to 42 U.S.C. § 1983

(Counts 1 and 2).  Ms. Gill also brought state law claims for negligent infliction of emotional distress

(Count 3); assault and battery (Count 4); false arrest (Count 5); and punitive damages (Count 6) .  In

January of 2010, Ms. Gill filed a First Amended Complaint adding a claim for interference with or

destruction of evidence (Count 7).  All of these claims stem from the circumstances surrounding  Ms.

Gill's arrest on the night of September 2, 2007.

      This matter is now before the court on four motions for summary judgment filed by Officer

Kovach, the City, Chief Mandopoulos, and Mr. Franklin. (ECF # 53, 54, 83, 86).  For the following

reasons, Officer Kovach's November 23, 2009 motion for summary judgment (ECF # 53) is granted in part and denied in part; the November 23, 2009 motion for summary judgment filed by City, Chief Mandopoulos, and Mr. Franklin (ECF # 54) is granted; and, the defendants' subsequent motions for summary judgment on Ms. Gill's spoliation of evidence claim (ECF # 83, 86) are granted.

## **FACTUAL BACKGROUND**[1]

In the early morning hours of September 2, 2007, Ms. Gill was drinking at Up A Creek Tavern (the "Tavern") in Warren, Ohio.  Due to her conduct, Ms. Gill was asked to leave and was escorted out of the Tavern by Shawn Tisher ("Mr. Tisher"), a security guard.  Ms. Gill admits to being highly intoxicated at the time; her recorded blood alcohol content was .30.[2]  Upon exiting the Tavern, Ms. Gill and Mr. Tisher encountered Officer Kovach, a Warren police officer who was on patrol in the area.  Mr. Tisher explained the situation to Officer Kovach and Officer Kovach asked Ms. Gill for her name and Social Security number.  Ms. Gill replied with an expletive, gave Officer Kovach a false name[3] and a false Social Security number, and ran towards the parking lot.  She entered the driver's side of a vehicle belonging to John Turner ("Mr. Turner"), another Tavern security guard.[4]  Ms. Gill claims that she

---

[1] Except as otherwise noted, the factual summary is based upon the undisputed facts set forth in the parties' statements of facts, the Plaintiff's Complaint, the deposition transcripts filed with the Court as part of the summary judgment motion briefing, and the information clearly visible in the video recording of the encounter at issue.  Those facts which are contested and have some support through deposition testimony, affidavit, or other evidence are specifically addressed below and shall be construed in the light most favorable to the Plaintiff as required under the Summary Judgment standards.

[2] Ms. Gill tested positive for cocaine, but claims that she had used cocaine two days earlier.  She also admits to using the prescription drugs vicodin and xanax earlier in the day.

[3] Ms. Gill told Officer Kovach that her name was "Holly Hunter."

[4] Mr. Turner claims that Officer Kovach arrested Ms. Gill for falsification before she entered his vehicle. (53-3 at 4).  Officer Kovach, however, stated that he arrested Ms. Gill only after she entered Mr. Turner's vehicle. (66-4 at 17).

entered Mr. Turner's vehicle, believing that it was the car of someone who had agreed to give her a ride home.  Mr. Turner claims that he had not given Ms. Gill permission to enter his vehicle.

Officer Kovach approached the drivers' side of Mr. Turner's vehicle and twice instructed Ms. Gill to exit the vehicle.  Ms. Gill replied by saying "no" and "I am not gonna."  Officer Kovach and another witness assert that Ms. Gill locked her arms around the steering wheel and leaned away from the drivers side door.  Officer Kovach then deployed a Taser X26 by firing two probes at Ms. Gill's chest.[5]  Officer Kovach then informed Ms. Gill that she was under arrest and instructed her to exit the vehicle again.[6]

Although they both generally agree about how the encounter started, Officer Kovach's and Ms. Gill's renditions of what occurred after the first two probes were deployed vary significantly.  Ms. Gill claims that Officer Kovach tasered her a second time, causing her to fall out of the vehicle.  She claims that while on her hands and knees, Officer Kovach tasered her a third time and pushed her to the ground by placing his foot on her back.  As she attempted to stand, she says that Officer Kovach activated the taser a fourth time, causing her to fall into the vehicle's side panel.  Ms. Gill claims that the video tape and the Taser's memory chip confirm that Officer Kovach tasered her a fifth time in stun gun mode and then handcuffed her hands behind her back. At this point, Officer Kovach would had tasered Ms. Gill

---

[5] The Ninth Circuit recently described the Taser X26 as follows:
The X26 uses compressed nitrogen to propel a pair of "probes"--aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires--toward the target at a rate of over 160 feet per second.  Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles.  The impact is as powerful as it is swift.  The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.  The tasered person also experiences an excruciating pain that radiates throughout the body.
*Bryan v. MacPherson*, — F.3d —, 2010 WL 2431482, at *3 (9th Cir. 2010) (citations and footnotes omitted).

[6] There is some dispute in the witnesses testimony as to whether Officer Kovach had told Ms. Gill she was under arrest even before she took off running for the car.

five times in thirty-six seconds.  There is no dispute that Officer Kovach, with the help of Mr. Turner, then loaded Ms. Gill into the police cruiser.

Ms. Gill admits that, while still handcuffed, she screamed and kicked the rear drivers' side window multiple times.  After she ceased kicking, she claims Officer Kovach opened the door and tasered her a sixth time, this time firing a second set of probes at her right hip.  There is no dispute that Officer Kovach then ordered Ms. Gill to walk to a second police cruiser, which had a "cage," or protective metal barrier that separates the back seat from the front seat.  The video tape confirms that Officer Kovach threatened Ms. Gill with another tasering if she did not comply with this command.

Upon exiting the police cruiser, Ms. Gill claims that Officer Kovach did not guide her with his hands but led her by the taser wires.  Before reaching the second cruiser, Ms. Gill either stumbled or broke into a run.  Officer Kovach tasered her a seventh time.  Ms. Gill fell to the ground and was knocked unconscious.  Ms. Gill claims that she was not resisting arrest but was unaware that she was being arrested and was attempting to free herself from what she perceived to be a dangerous situation.

Officer Kovach's original account of the same events is as follows: Ms. Gill, having exited the car after being tasered once, refused to comply with his orders to lay down and put her hands behind her back.  Officer Kovach stated that he activated the taser a second time; handcuffed Ms. Gill; and, with the help of Mr. Turner, placed Ms. Gill into his police cruiser.  Ms. Gill began screaming and kicking the cruiser's rear window.  Officer Kovach also claims that Ms. Gill also attempted to enter the cruiser's front seat.  In response, he said that he opened the cruiser's rear door and tasered her a third time.  Later, Officer Kovach opened the cruiser's rear door and instructed Ms. Gill to exit and walk to the second cruiser.  Rather than going to towards the second cruiser, Ms. Gill ran toward a crowd of people.  To prevent Ms. Gill from fleeing, Officer Kovach tasered her a fourth time, causing her to fall and be knocked unconscious.

- 4 -

An Emergency Medical Services ("EMS") team responded and took Ms. Gill to the hospital. Later that morning, Officer Kovach completed a Response to Resistance report form. (ECF # 66-2). The report consisted of three paragraphs handwritten by Officer Kovach. In the report, Officer Kovach explicitly stated that he tasered Ms. Gill several times, including while she was handcuffed inside the cruiser. *Id.*, at 4. That same day, Sergeant Eric Merkel ("Sergeant Merkel"), Officer Kovach's Turn Commander, noted on the report that the force described by Officer Kovach "was reasonable under the circumstances." (ECF # 66-2 at 5). On September 3, 2007, Division Commander Lieutenant Giovannone ("Lieutenant Giovannone") noted on the report that there was "[n]o violation of policy or procedure . . . ." *Id.* Finally, on September 5, 2007, Chief Mandopoulos also signed off on the report. None of these officers, however, raised any concerns about Officer Kovach's use of force.

On September 18, 2007, Chief Mandopoulos requested that Sergeant J. L. Cole ("Sergeant Cole") commence an investigation of the incident. The next day, Chief Mandopoulos placed Officer Kovach on administrative leave. Sergeant Cole viewed the mobile video recorder footage (the "video") from Officer Kovach's cruiser, met with Ms. Gill and other witnesses, and reviewed numerous statements, policies, and reports. The Ohio Bureau of Criminal Identification & Investigations (the "BCI") also examined the memory chip from Officer Kovach's Taser X26 and found that it had been activated seven times in approximately five minutes. Sergeant Cole submitted a  report  to Chief Mandopoulos, summarizing his findings and concluding that Officer Kovach violated numerous City policies. Chief Mandopoulos agreed with at least some of Sergeant Cole's findings and suspended Officer Kovach for sixty days without pay.

Although the City has a policy of photographing taser penetration sites after an arrest of a tasered suspect, no such photographs were taken after Ms. Gill's arrest. Furthermore, the clothing that Ms. Gill wore when Officer Kovach tasered her went missing. On October 2, 2007, packages containing Ms.

Gill's belongings, including the clothes in question, were sent to the BCI.  On April 16, 2008, Sergeant Michael Marret of the Warren Police Department picked up Ms. Gill's clothes and other belongings from the BCI.  On October 23, 2009, Ms. Gill deposed Lieutenant Joseph Marhulik ("Lieutenant Marhulik") of the Warren Police Department.  At Lieutenant Marhulik's deposition, Ms. Gill learned that her clothing was missing and that the Warren Police Department could not account for its absence.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986)*; *Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 451 (6th Cir. 2004)*.  If the movant succeeds, the burden then shifts to the nonmoving party to demonstrate the existence of a material dispute as provided in Rule 56(e)(2):

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial.

FED. R. CIV. P. 56(e)(2); *see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)*.  Parties opposing summary judgment must go beyond the pleadings and produce some type of evidentiary material in support of their position.  *See Celotex, 477 U.S. at 324*.

In determining whether a genuine issue of material fact exists, this court must view all of the evidence in the light most favorable to the nonmoving party.  *See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)*; *Hamby v. Neel, 368 F.3d 549, 556 (6th Cir. 2004)*; *Williams v. Int'l Paper Co., 227*

F.3d 706, 710 (6th Cir. 2000).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson,* 477 U.S. at 248.  An issue is "genuine" if the evidence is such that a reasonable juror "could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict" or whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law."  *Id.* at 252. General statements or conclusory allegations do not create specific fact disputes "showing that there is a genuine issue for trial."  *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888-89 (1990).

## ANALYSIS

### I.    FEDERAL CLAIMS

Title 42, section 1983, of the United States Code provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Because the Fourth Amendment has been incorporated by the due process clause of the Fourteenth Amendment, state officials are subject to §1983 lawsuits under these amendments.

To succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that a right secured by the Constitution or laws of the United States was deprived, and (2) that the defendant committed the violation while acting under color of state law.  *Jones v. Duncan,* 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.  It is undisputed that the defendants' alleged conduct was committed under color of state law.  Accordingly, this court need only address the issue of whether Ms. Gill was deprived of a right secured by the Constitution or laws of the United States.

**A.**     **Claims Against Officer Kovach in His Individual Capacity**

Ms. Gill is suing Officer Kovach in his individual capacity, arguing that her arrest was unlawful because it was made without probable cause in violation of her Fourth Amendment rights.  In addition, Ms. Gill argues that Officer Kovach's actions constituted excessive force.

1.     Unlawful arrest

The Fourth Amendment forbids "unreasonable searches and seizures." U.S. CONST. amend. IV. "A warrantless arrest by a law officer is reasonable under the Fourth Amendment if, given the facts known to the officer, there is probable cause to believe that a crime has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  Probable cause exists when "at that moment[,] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  "The Supreme Court has made clear that there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the 'factual and practical considerations of everyday life' that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred or is about to occur." *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998) (citing *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

Officer Kovach argues that he had probable cause to arrest Ms. Gill because when asked to identify herself, she gave him a false name and Social Security number.  In addition he had been made aware of her conduct in the Tavern, and after giving false information she fled and resisted arrest.  Ms. Gill does not refute the claim that she gave Officer Kovach a false name and Social Security number,

and admits that she ran and resisted Officer Kovach, although she claims she did not know that he was trying to arrest her.

It is clear that Officer Kovach had probable cause to arrest Ms. Gill for falsification.[7]  Ohio Revised Code § 2921.13(A)(3) states that "[n]o person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made[] when . . . [t]he statement is made with purpose to mislead a public official in performing the public official's official function."  On the morning of September 2, 2010, Officer Kovach was on duty and was patrolling the area near the Tavern, performing his official functions.  After Officer Kovach ran Ms. Gill's false name and Social Security number, the facts and circumstances were such that a reasonable person would determine with reasonable probability that Ms. Gill had provided false information to a police officer with the intent to mislead him in his duties.  See *State v. Brassfield*, No. 83331, 2004 WL 1068781, at *7 (Ohio App. Ct. May 13, 2004) (finding that a defendant giving a false social security number and giving a false name, in conjunction with other suspicious behavior and circumstances, "constitutes ample probable cause to search the vehicle . . . for evidence.").  The fact that the falsification charge against Ms. Gill was ultimately dropped is irrelevant, as the validity of the arrest does not depend on a conviction, or even the existence of actual guilt .  See *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) (" The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest.").  Accordingly, Officer Kovach is entitled to summary judgment on the claim of unlawful arrest.

       2.      <u>Excessive force</u>

---

[7] Based on the undisputed facts, Officer Kovach would have had probable cause to arrest her for disorderly conduct and/or public intoxication, as well as numerous other violations.

Although Officer Kovach's warrentless arrest of Ms. Gill was lawful, this court must nonetheless consider whether the force used by Officer Kovach in effectuating the arrest was excessive in light of the circumstances.  The Supreme Court has found that the right to be free from excessive force during an arrest or investigatory stop is guaranteed by the Fourth Amendment's prohibition against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 393-94, (1989). However, the Supreme Court has also noted that its "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* 396.

Under *Graham*, a court must determine the reasonableness of an officer's use of force by performing a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. at 396 (internal quotation marks omitted).  Thus, this Court must weigh Ms. Gill's interest in not being tasered against Officer Kovach's interest in effectuating the arrest, and in protecting Ms. Gill, himself, other Officers, and the public.  This balancing exercise is guided by an evaluation of  the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  This Court might also consider the number of people at risk from the suspect's conduct, the suspect's demeanor, the size and stature of the parties involved, and the suspect's degree of intoxication and noncompliance. *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008). The "'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

When weighing  these factors, the Court must also be mindful of the level of tension and uncertainty that the officer may be facing during the actual events.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id.*  The Sixth Circuit has elaborated on this standard noting that "[w]e must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.  What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." *Smith v. Freland*, 954 F. 2d at 347.

There may be a question of fact as to whether Officer Kovach originally arrested Ms. Gill for falsification before she ran and entered a car, or whether she was arrested only after she entered the car.[8] Regardless, Officer Kovach had probable cause to arrest Ms. Gill before any force was exerted; and, at some point early in the encounter she was, in fact, arrested  for both falsification and unauthorized use of a vehicle, a misdemeanor and a felony, respectively.  Her entry into the front seat of a vehicle could have evidenced an intent to operate the vehicle, which, based on her level of intoxication could easily have been construed as an extremely dangerous situation by Officer Kovach.  Although the vehicle was not hers, Officer Kovach may not have known at the time whether she had the keys, whether she was planning on trying to drive the car in her highly intoxicated state, or even whether there might be weapons in the car that she could access.

Eventually, Ms. Gill was also charged with assault, resisting arrest, and criminal damaging.  The violent and erratic actions resulting in these charges occurred before or during most of the shocks

---

[8] Mr. Turner claims that Officer Kovach arrested Ms. Gill for falsification before she entered his vehicle. (ECF # 53-3 at 4).  Officer Kovach, however, stated that he arrested Ms. Gill only after she entered Mr. Turner's vehicle. (ECF # 66-4 at 17).

- 11 -

inflicted upon her.  Ms. Gill herself admitted that throughout the encounter she was trying to get away from Officer Kovach.  The fact that she claims that she did not realize she was being arrested and felt herself to be in danger, does not excuse her behavior and is not relevant to whether the officer's actions were objectively reasonable.  He could not have known what her reasons for resisting may have been, nor would her subjective reasons for fighting and fleeing diminish the need for the officer to gain control over her.

The officers' safety is also an important consideration.  Ms. Gill had a blood alcohol level of .30 and tested positive for cocaine.  She used profanity, behaved erratically, screamed loudly, kicked at his car windows, tried to escape, and repeatedly failed to comply with Officer Kovach's verbal commands. He could easily have believed that she would have attempted to harm him.  Furthermore, an increasingly hostile crowd formed in the parking lot around the officers, presenting significant safety concerns.  (ECF # 66-4, at 26-27).  According to one police officer, two bartenders there "seemed to be inciting the crowd to attack us." *Id.* at 27.  Another police officer at the scene stated:

> Throughout the incident, I tried to watch the crowd since the bar was closing and numerous people were screaming at officers and were trying to intervene with the arrest.  Due to the position of the cruisers and ambulance, patrons were unable to leave and were starting to become hostile toward officers.

*Id.* at 26.  A jury could find that it was reasonable under these circumstances for an officer to use force that might otherwise not be necessary in order to get the subject under control quickly before the crowd, also got out of control and further compromised the safety of the officers, the subject, and other bystanders.  Further, because there was a crowd in close proximity, an officer may have had a heightened level of concern for the safety of the bystanders given Ms. Gill's irrational, erratic, and violent behaviors.  While being led to the second cruiser, she admits that she either stumbled or ran towards the crowd of onlookers.  As even Ms. Gill cannot say whether she was running or had stumbled,

the officer on the scene could have objectively believed she was attempting to run into the crowd. At this point, even more than before, a reasonable officer may have been concerned not only with his own safety, but with the safety of the onlookers.[9]

There also appears to be no real question that at various points throughout the encounter, Ms. Gill resisted arrest. She admits that she originally swore, gave a false name and social security number and ran from the police. She also admitted that throughout the encounter she was trying to flee from the officers. While in the vehicle, she grabbed onto the steering wheel and leaned away from Officer Kovach as he approached her. Once she exited Mr. Turner's car, although Officer Kovach told her to lay down and put her hands behind her back, the video shows that she stood up and attempted to walk away from him. [10] Once inside Officer Kovach's police car, she was physically aggressive, kicking at the cruiser's window several times and screaming into the front seat.

The only *Grahm* factor that clearly weighs in Ms. Gills favor is her relatively small size and stature as compared to Officer Kovach. At approximately 5'6" tall and 130 pounds, she was smaller than Officer Kovach , who stands 5'10" tall and weighs 230 pounds.

Construing the facts in the light most favorable to Ms. Gill, for purposes of this motion, the Court must accept that Officer Kovach tasered Ms. Gill seven times in a span of several minutes, once while she knelt with her hands on the ground and twice while she was handcuffed, several times while she confined within a vehicle (be it Mr. Turner's car or Officer Kovach's cruiser), and sometimes in

---

[9] The safety of the on-lookers may be considered even if Officer Kovach himself did not take them into consideration during his actions. The standard is not subjective and does not rely on Officer Kovach's own mindset or intent. The question at hand is whether a reasonable officer would have reacted the same way under the same circumstances. . *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008).

[10] Ms. Gill also claims, however, that even when she was attempting to comply with Officer Kovach's commands she could not do so because of his incessant tasering. In the video, Ms. Gill can be heard saying "OK" in response to Officer Kovach's commands, she can be seen with her hands in the air, and she appears to allow Officer Kovach to handcuff her once he stopped tasering her.

rapid succession, such that Ms. Gill may not have had time to comply with Officer Kovach's directives before she was shocked again.[11]  Five of the taser shocks occurred within thirty-six seconds.  There is also evidence that would suggest that Officer Kovach tasered her in a manner that caused her to body to fall several times, striking her head on both the vehicle and the pavement and rendering her unconscious.  Further, there is no evidence that Officer Kovach attempted to use a lesser degree of force to obtain control before resorting to the taser, although he did manage to handcuff Ms. Gill at some point during the encounter.  Finally, it is undisputed that Chief Mandopoulos found that Officer Kovach acted against police policy by tasering Ms. Gill when she was handcuffed in the back of his car; by failing to physically take charge of her when he was transferring her from his car to Officer Miller's car (which had a cage separating the front from the back seat) in order to prevent injury to her and the possibility of escape; and, by making official statements or reports that were inaccurate, false, or improper, and that were contradicted by the video recording of the incident.

There is no question, taking into consideration the factors set forth by the United States Supreme Court in *Graham*, even when this Court construes the facts in a light most favorable to Ms. Gill, that Officer Kovach was entitled to use some level of force to control and restrain Ms. Gill.  Ms. Gill was clearly highly intoxicated (and tested positive for cocaine with admitted use of vicodin and xanax that day); she was non-compliant, resisting arrest, attempting to flee, and acting in an erratic and violent manner; there were bystanders in close proximity; and, an increasingly menacing situation was developing in the bar's parking lot.  Nonetheless, the level of force used by Officer Kovach must be examined in light of all of the circumstances surrounding the encounter.  Viewing the allegations in a light most favorable to Ms. Gill as required by the summary judgment standard, a jury could find that some of Officer Kovach's actions were objectively unreasonable and, that he exercised excessive force

---

[11] There is evidence to suggest that the effects of a single taser shock can last up to several minutes.

during the arrest. As genuine issues of fact remain on this issue, Officer Kovach's Motion for Summary Judgment on Plaintiff's § 1983 excessive force claim must be denied.

Even if he did use excessive force, Officer Kovach claims, that he cannot be liable in a civil action because he is protected by qualified immunity.  Qualified immunity is an affirmative defense that protects government officials performing discretionary functions from civil suits if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether qualified immunity is warranted, a court must ask (1) whether the alleged facts, taken in a light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established in the specific context so that a reasonable official would understand that he is violating that right. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  A court need not address these steps in any particular order, nor must a court address both steps if the defendant makes an insufficient showing on one. *Pearson v. Callahan*, 129 S.Ct. 808, 821 (2009).  Whether a defendant is entitled to qualified immunity is a purely legal question appropriate for summary judgment, but summary judgment is inappropriate where "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Adams v. Metiva*, 31 F.3d 375, 287 (6th Cir. 1994).  Therefore, this court must view the disputed facts in a light most favorable to the plaintiff when making its determination on the issue of qualified immunity. *See Champion*, 380 F.3d at 900; *Kelley v. LANs*, No. 3:05-CV-7474, 2007 U.S. Dist. LEXIS 51944, at * 13-14 (N.D. Ohio Jul. 18, 2007).

Generally, "[t]he right to be free from excessive force is a clearly established right." *Walton v. Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993), overruled on other grounds by *Saucier v. Katz*, 533 U.S. 194 (2001); *Kijowski*, 2010 WL 1378601, at * 6 ("[T]he right to be free from physical force when one is not resisting the police is a clearly established right.") (internal citation and quotation omitted).

- 15 -

Therefore, if the jury accepts Ms. Gill's view of the facts and finds that Officer Kovach did exercise excessive force during the arrest, he will not be entitled to qualified immunity.  His motion for summary judgment on Ms. Gill's excessive force claim is, therefore, denied.  However, because summary judgment is inappropriate where "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," *Adams v. Metiva*, 31 F.3d 375, 287 (6th Cir. 1994), the Court cannot determine, as a matter of law, that qualified immunity does not attach.  If a jury finds that Officer Kovach's view of the facts is correct, and no constitutional violation occurred, qualified immunity may shield Officer Kovach from any liability for Ms. Gill's alleged injuries.

### B.  Claims Against the City, Chief Mandopoulos and Mr. Franklin

Ms. Gill has also sued the City, Chief Mandopoulos,  and Mr. Franklin in their official capacities.  As a rule, local governments may not be sued under 42 U.S.C. § 1983 for an injury inflicted solely by employees or agents under a theory of *respondeat superior*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  "Instead, it is when the execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id.*  at 694; *DePiero v. City of Macedonia*, 180 F.3d 770, 786 (6th Cir. 1999).  Moreover, the policy or custom must be the moving force of the constitutional violation in order to establish municipal liability.  *Monell*, 436 U.S. at 690.

Liability against a municipality is available pursuant to multiple theories.  *See id.* at 660-61 (an express municipal policy); *City of St. Louis v. Praprotnick*, 485 U.S. 112, 127 (1988) (a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law"); *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) ( a failure to act where the "inadequacy [of the existing practice is] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately indifferent to the [plaintiff's rights]"); *Leach v. Shelby County Sheriff*, 891 F.2d 1241,

1247 (6th Cir. 1989) (a ratification of a municipal employee's unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct). Here, Ms. Gill claims that the City is liable because it ratified Officer Kovach's actions, and espoused a policy of deliberate indifference to the constitutional rights of others by failing to properly train its officers.

### 1. Failure to Train

First, Ms. Gill claims that the City failed to properly train its officers. The Supreme Court in *Canton* has explained:

> The issue . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (footnotes omitted).

There are "at least two types of situations that would justify a conclusion of deliberate indifference in the failure to train police officers." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999). One situation "is where the city fails to act in response to repeated complaints of constitutional violations by its officers." *Id.* A second situation "is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction." *Id.* In both cases, deliberate indifference is established when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city

- 17 -

can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 388-89 (1989).

In sum, to succeed on this claim, a plaintiff must prove that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.*" Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

The City has a set of policies, including policies on the use of force, and it requires officers to learn and abide by those policies. The City regularly updates its policies and retrains its officers accordingly. Since 2005, the City has required each of its officers to complete forty hours per year of in-service training, wherein officers are instructed on the law; first aid; perishable skills (including handcuffing, control methods, and de-escalation); firearms training; less than lethal weapon training; defensive tactics; and, City policies and procedures. (ECF # 54-3 at 189). Officer Kovach attended these trainings in 2005 and 2006. (ECF # 66-4 at 69-90). Lieutenant Marhulik, a certified taser instructor, conducts some of the training and, on February 6, 2007, certified that Officer Kovach had been trained on the proper and safe use of the Taser M26 and X26. (ECF # 66-4 at 67).

Nevertheless, Ms. Gill claims that the City inadequately trained its officers on the appropriate use of force. Specifically, Ms. Gill claims that the City's failure to adequately train its officers is demonstrated by (1) a history of previous allegations of excessive force levied against the City and its officers; (2) an investigation of the City's police department by the United States Department of Justice's Civil Rights Division (the "DOJ"); and, (3) Officer Kovach's superiors' response to, and evaluation of, his conduct.

In support of her claim that the City failed to adequately train its officers, Ms. Gill cites several prior allegations of excessive force against the City and its officers in hopes of establishing a history of

constitutional violations.  *See Rogers v. Hipple*, No. 4:03-CV-1899 (N.D. Ohio, filed Sept. 9, 2003) (alleging excessive force stemming from a May 4, 2003 incident), *Clay v. City of Warren*, 4:03-CV-1636 (N.D. Ohio filed Aug. 1, 2003) (alleging excessive force stemming from a March 26, 2003 incident); *Gambone v. City of Warren*, 04-CV-360 (alleging unreasonable search and seizure stemming from a February 27, 2002 incident), and *Kimble v. Hoso*, 4:03-CV-2379 (alleging excessive force stemming from a June 28, 2003 incident).

Ms. Gill also cites a March 3, 2006 letter sent by the DOJ to the City's mayor, Mr. Franklin, and Chief Mandopoulos.  The DOJ letter states that its investigation of complaints against the City's police department "has thus far revealed that many officers are not following [Warren Police Department] policies and procedures."  (ECF # 66-6 at 3).  The DOJ letter also makes numerous recommendations for improving the City's policies and training.

Although the cases cited by Ms. Gill all involved the use of force, they all involve incidents that occurred more than four years prior to Ms. Gill's arrest.  Events that occurred in 2002 and 2003 cannot constitute the moving force behind Ms. Gill's arrest more than four years later without any evidence to support such an inference.[12]  With regard to the DOJ investigation, even if the court determined that the DOJ letter was admissible evidence, Ms. Gill has not established that the DOJ's concerns contributed to her alleged injury or that the DOJ's recommendations were not implemented.  In fact, the City did implement a new training policy on October 16, 2006, after receiving the DOJ's letter and before Ms. Gill's arrest.  The City also devoted a portion of its 2006 in-service training to addressing issues raised during the DOJ investigation.  (ECF # 66-4 at 86).  The DOJ letter, without more, does not create a

_____

[12] In her motion for summary judgment, Ms. Gill also notes that Officer Kovach was involved in an incident earlier in 2007, wherein Officer Kovach was accused of using excessive force.  That incident resulted in litigation but eventually settled before the court made any findings.  *See Dukes v. City of Warren*, No. 4:08-CV-00381 (N.D. Ohio filed Feb. 15, 2008).  This single incident, however, does not establish a history of constitutional violations from which a reasonable juror could infer deliberate indifference on behalf of the City.

genuine issue of material fact.  *See Miller v. City of Columbus*, No. 2:05-CV-425, 2007 WL 915180, at

*17 (S.D. Ohio Mar. 26, 2007).  Consequently, the existence of some prior cases against the City and

the results of DOJ's investigation are insufficient to overcome a motion for summary judgment.

Ms. Gill next asserts that Officer Kovach's superiors failed to recognize violations of the City's

policies, and that a reasonable juror could infer that the City failed to adequately train its officers.

According to Ms. Gill:  Sergeant Merkel, Lieutenant Giovannone, and Chief Mandopoulos failed to

recognize Officer Kovach's excessive use of force when they signed his Response to Resistance report

finding no violation of the City's policies or procedures.  It was only after concluding the formal

investigation that Chief Mandopoulos found that Officer Kovach violated several of the City's policies,

and those violations occurred only when he deployed his taser "when Ms. Gill was handcuffed in the

back of the cruiser."  (ECF # 75-4 at 6-9).

In *Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397 (1997), the

Supreme Court noted:

> In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a
> failure-to-train claim without showing a pattern of constitutional violations, we simply
> hypothesized that, in a narrow range of circumstances, a violation of federal rights may
> be a highly predictable consequence of a failure to equip law enforcement officers with
> specific tools to handle recurring situations. The likelihood that the situation will recur
> and the predictability that an officer lacking specific tools to handle that situation will
> violate citizens' rights could justify a finding that policymakers' decision not to train the
> officer reflected "deliberate indifference" to the obvious consequence of the
> policymakers' choice-namely, a violation of a specific constitutional or statutory right.
> The high degree of predictability may also support an inference of causation-that the
> municipality's indifference led directly to the very consequence that was so predictable.

*Id.* at 409.  Ms. Gill must, therefore, show that there was a "likelihood that the situation would recur"

and that it was predictable "that an officer lacking specific tools to handle the situation would violate

citizens' rights."  *Id.*

Ms. Gill has again failed to set forth sufficient evidence to create a genuine issue of material fact. The City had specific policies and expected its officers to abide by such policies. The City requires its officers to undergo forty hours of in-service training per year, focusing largely on the City's policies concerning the use of force. The City also trains and certifies its officers on the proper use of tasers. Officer Kovach, along with all other active officers completed the required training in 2005 and 2006. It cannot be said that there is a likelihood that a similar situation would reoccur, and it cannot be said that it was predictable that any officer lacked specific tools or would violate citizens' rights. In light of this evidence, a reasonable juror could not infer that the City failed to adequately train its officers or that such failure, if any, amounted to deliberate indifference. Consequently, the City's motion for summary judgment is granted with respect to this claim.

### 2.    Ratification

A plaintiff can establish a municipal liability claim by demonstrating that a final municipal policymaker approved of a subordinate's decision and the basis for it, approved of an investigation that was so inadequate, or failed to punish the responsible parties, so as to constitute a ratification of their alleged use of excessive force. *Wright v. City of Canton*, 138 F.Supp.2d 955, 966 (N.D. Ohio 2001), citing *Praprotnik*, 485 U.S. at 127; *Johnson v. City of Memphis*, 2008 U.S. Dist. LEXIS 1199, at *11 (W.D. Tenn. Jan. 8, 2008). The Sixth Circuit has recognized such ratification claims. In *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985), a prisoner threatened a law enforcement officer. Later, a sheriff's deputy allowed someone to enter a prisoner's cell to violently beat him. A state district court judge ordered the sheriff to investigate the incident but the sheriff failed to do so. The Sixth Circuit held that:

> [t]he Sheriff's subsequent failure to order and direct an investigation which disclosed exactly who were the perpetrators of these brutal violations to the U.S. Constitutional and to administer censure and punishment served to confirm the existence of an unstated 'policy' of toleration of illegal brutality toward any county prisoner who threatened the life of a sheriff's deputy.

- 21 -

*Id.* at 184

In *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989), a sheriff failed to investigate a paraplegic inmate's inadequate health care and failed to punish those responsible. There, the Sixth Circuit also found liability because the sheriff knew that "at least 14 other paraplegics had received similar deplorable treatment" without taking any action. *Id.* at 1248.

Here, the City did conduct an investigation of the Officer Kovach incident, and he was disciplined for his actions. At the request of Chief Mandopoulos, Sergeant Cole commenced an investigation and summarized his detailed findings in a report submitted to Chief Mandopoulos approximately three weeks later. Because the City conducted an extensive investigation and suspended Officer Kovach for sixty days without pay, this case is clearly distinguishable from *Marchese* and *Leach*, where no investigation was conducted and no discipline was meted.

Ms. Gill argues, in essence, that the investigation came too late, and the failure to immediately discipline Officer Kovach based solely on his Response to Resistance report is enough to constitute ratification. Furthermore, Ms. Gill argues that, had the media not obtained the video recording of the event, no formal investigation would have been launched. Nothing in the record before this Court, however, suggests that a superior's review and opinion of an officer's Response to Resistance form concludes an investigation. Ms. Gill has not proffered any evidence as to when, exactly, the video became pubic, nor has she provided any other evidence connecting the investigation to the media's release of the video. Given the evidence before this Court of the City's investigation and suspension of Officer Kovach in the weeks following Ms. Gill's arrest, Ms. Gill has failed to raise a genuine issue of material fact on the issue of ratification, and the claim cannot survive summary judgment.

## II.    STATE LAW CLAIMS

### A.    Claims Against The City

Pursuant to Ohio's Political Subdivision Tort Liability Act, a political subdivision is immune from liability for the intentional torts committed by its employees, or for any actions of its employees that may injure or cause death when the action is taken in connection with a governmental or proprietary function. OHIO REV. CODE § 2744.03(A); § 2744.02(A)(1).  Ms. Gill concedes that her state law claims against the City fail.  Accordingly, summary judgment in favor of the City is granted with respect to all of Ms. Gill's state law claims.

### B.    Claims Against Officer Kovach

#### 1. Intentional Infliction of Emotional Distress

To establish a claim of intentional infliction of emotional distress, a plaintiff must generally prove that:

> 1. the actor intended to cause emotional distress or knew or should have known that his actions would result in serious emotional distress to the plaintiff;
>
> 2. the conduct complained of has been so outrageous in character and extreme in degree as to go beyond all bounds of decency;
>
> 3. the conduct proximately caused the plaintiff's injury; and
>
> 4. the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Ashcroft v. Mt. Sinai Medical Ctr.*, 68 Ohio App.3d 359, 366 (Ohio Ct. App. 1990).

In general, a viable claim for intentional infliction of emotional distress "is one in which the recitation of the facts to an average member of the community would arouse his arouse his resentment against the actor and lead him to exclaim, 'Outrageous!'" *Finley v. First Realty Prop. Mgmt., Ltd.*, 185

Ohio App.3d 366, 391 (Ohio App. Ct. 2009) (quoting *Yeager Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers,* 6 Ohio St.3d 369, 375 (1983))..  Although mental anguish "describes emotional injury which is both severe and debilitating" based on a reasonable person standard, *Paugh v. Hanks,* 6 Ohio St.3d 72, 78 (1983), "[t]he severe and debilitating requirement does not apply to emotional distress cases which are accompanied by physical injury," *Day v. NLO,* 851 F.Supp. 869, 878 (S.D. Ohio 1994); *see also Adkins v. Gen. Motors,* 556 F.Supp. 452, 458 (S.D. Ohio 1983) ("[U]nder Ohio law, damages for intentional infliction of emotional distress are recoverable if contemporary physical injury was inflicted . . . .").

Officer Kovach claims that his actions were neither extreme nor outrageous and that Ms. Gill has not shown proof of mental anguish.  The allegations made by Ms. Gill, taken as true, do not rise to the level of "extreme and outrageous" as required by Ohio courts.  Even if a jury were to find that Officer Kovach used excessive force by repeatedly using a taser to obtain control over Ms. Gill,  who was highly intoxicated, resisting, combative, and erratic, they could not legitimately find that his actions were  beyond all possible bounds of decency.  Unreasonable and inappropriate actions do not automatically equate to extreme and outrageous conduct as is required for a charge of intentional infliction of emotional distress.  There is no evidence that Ms. Gill suffered permanent physical harm, that her emotional harm was debilitating, or  that Officer Kovach intended to cause Ms. Gill severe emotional distress at the time of the encounter.  Thus, Officer Kovach's motion for summary judgment on this claim is granted.

2.     Assault and Battery

In Ohio, an assault is an unlawful offer or attempt, coupled with a present ability, to inflict an injury upon the person of another. *Daniel v. Maxwell,* 176 Ohio St. 207, 208 (1964).  A battery occurs when a person acts intending to cause a harmful or offensive contact, and when a harmful contact

results.  *Love v. City of Port Clinton*, 37 Ohio St.3d 98, 99 (1988).  Contact which is offensive to a reasonable sense of personal dignity is offensive contact. *Id.*

The Ohio Supreme Court has stated, "[a]n officer making an arrest has the right to use such force as may be necessary to overcome any resistance . . . but he must use no more force or violence than is reasonably necessary for the purpose and if he does he makes himself and his sureties liable." *Drolesbaugh v. Hill*, 64 Ohio St. 257, 264 (1901).    Therefore, Ms. Gill's "claims for assault and battery rise or fall with [her] excessive force claim." *Kepley v. Lantz*, No. 3:05-CV-7474, 2007 U.S. Dist. LEXIS 51944, at *31 (N.D. Ohio July 18, 2007).  Because this Court has found that Ms. Gill's excessive force claim presents genuine issues of material fact for a jury to resolve, her claims for assault and battery also survive summary judgment.  Accordingly, Officer Kovach's motion for summary judgment on these claims is denied.

> 3.    <u>False Arrest</u>

"False imprisonment consists of confining one intentionally without lawful privilege and against his consent within a limited area for any appreciable time." *Feliciano v. Kreiger*, 50 Ohio St.2d 69 (1977).  In their essential elements, false imprisonment and false arrest are indistinguishable in that "each claim requires proof that one was intentionally confined within a limited area, for any appreciable time, against his will and without lawful justification." *Strickland v. Tower City Mgmt. Corp.*, No. 71839, 1997 WL 793133, at *4 (Ohio App. Ct. Dec. 24, 1997), citing *Ashcroft*, 68 Ohio App.3d at 364. "[T]o succeed on a claim of false arrest or imprisonment, a plaintiff must establish that the defendants were without legal authority to arrest and detain him and that the detention was not accomplished pursuant to accepted legal procedures." *McFinley v. Bethesda Oak Hosp.*, 79 Ohio App.3d 613, 616 (1992)

Ohio Revised Code § 2935.03 (A)(1) states that an officer has the authority to arrest and detain individuals "found violating" the laws of the state, or municipal ordinances, until a warrant can be obtained. The language "found violating" has been interpreted to authorize warrantless arrests for misdemeanors "only where the offense has been committed in the officer's presence." *State v. Mathews, 46 Ohio St.2d 72, 75-76 (1976)*.

The record before this court shows that Officer Kovach was on duty and was patrolling the area near the Tavern on September 2, 2007. When he encountered the disturbance at the Tavern, he asked Ms. Gill for her name and Social Security number. Ms. Gill responded with a false name and Social Security number. Officer Kovach then arrested Ms. Gill without a warrant for, inter alia, committing falsification, a misdemeanor. Because the misdemeanor was committed in Officer Kovach's presence, he had legal authority to arrest and detain Ms. Gill. Consequently, Officer Kovach's motion for summary judgment on this claim is granted.

4.     Spoliation of Evidence

Ohio recognizes a claim for the destruction of evidence, known as spoliation of evidence, and a party may raise such a claim where (1) there is pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts. *Smith v. Howard Johnson Co., 67 Ohio St.3d 28, 29 (1993)*.

Ms. Gill claims that when Officer Kovach tasered her, two sets of taser probes penetrated her skin on her chest and right hip, causing much greater pain and damage than if the probes had only attached to her clothing or merely made contact with the surface of her skin. All parties agree that the second set of taser probes penetrated the skin on her hip. Ms. Gill, however, argues that the first set of

- 26 -

taser probes penetrated the skin on her chest.  She argues that penetration was likely because the taser strikes to her chest caused her great pain and caused her to fall from the vehicle.  She claims that Officer Kovach's spoliation of her clothing disrupted her case because the evidence was necessary to establish that the first set of taser probes penetrated the skin on her chest.

Ms. Gill's case, however, has not been disrupted by the spoliation of her clothing because all of the evidence before this Court clearly establishes that the first set of taser probes did not penetrate the skin of her chest.  First, the EMS records state that the "tazer barbs to chest did not pierce skin" while noting "tazer bar to right hip, clothing removed and barb left in place" (ECF # 83-3 at 3).  Second, the hospital records show that the taser probes penetrated Ms. Gill's skin at the hip and not at the chest. (ECF # 83-4 at 4).  Finally, Lieutenant Marhulik testified that taser noises from the video demonstrate that the first set of probes did not penetrate her chest, while the second set of probes did penetrate her hip. He also testified that experiencing pain and falling are not inconsistent with being tasered by probes that do not penetrate the skin.  All of the evidence in this case demonstrates that the first set of taser probes did not penetrate the skin of Ms. Gill's chest.  Consequently, Ms. Gill has not established that the disappearance of her clothing has disrupted her case, and summary judgment on this claim in favor of Officer Kovach is appropriate.

5.    Political Subdivision Employee Immunity

Officer Kovach claims that, as an employee of a political subdivision, he is entitled to immunity pursuant to Ohio Revised Code § 2744.03(A)(6).  That section provides a city employee is immune from "a civil action brought . . . to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a  governmental or proprietary function" unless the employee acted outside the scope of his employment, acted "with malicious purpose, in bad faith, or in

a wanton or reckless manner," or unless "liability is expressly imposed upon the employee by a section of the Revised Code."  OHIO REV. CODE § 2744.03(A)(6)(a)-(c).

Malice is "that state of mind under which a person's conduct is characterized by hatred, ill will or spirit of revenge" or "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."  *Preston v. Murty*, 32 Ohio St.3d 334, 336 (1987)  Bad faith is "a dishonest purpose, conscious wrongdoing or breach of a known duty by some ulterior motive or ill will characterized by fraud."  *Kalain v. Smith*, 25 Ohio St.3d 157, 159 n.1 (1986).  Wanton conduct is the failure to exercise any care whatsoever toward one to whom a duty of care is owed under the circumstances in which there is a great probability of resulting harm.  *Hawkins v. Ivy*, 50 Ohio St.2d 114, 117-18 (1977).  An act is committed recklessly if it is done "with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than necessary to make the conduct negligent."  *Caruso v. State*, 136 Ohio App. 3d 616, 621 (Ohio App. Ct. 2000).

There exists a presumption of immunity for officers engaging in official duties.  *Knox v. Hetrick*, No. 91102, 2009 WL 792357, *3 (Ohio App. Ct. Mar. 26, 2009).  A plaintiff must produce sufficient evidence to rebut the presumption of immunity.  *Cook v. City of Cincinnati*, 103 Ohio App.3d 80, 91 (1995).

Ms. Gill offers Officer Kovach's words and actions in the video as evidence of Officer Kovach's mental state at the time of Ms. Gill's arrest.  She has also provided evidence that Officer Kovach showed the video of the encounter to coworkers and returned to the Tavern to show the video.  Further, Ms. Gill cites to evidence that, if true, would show that  Officer Kovach knowingly lied in his Response to

Resistance report,[13] allowing an inference that he had acted recklessly or in bad faith.  From this evidence, a reasonable juror could find that Officer Kovach acted in maliciously, wantonly, recklessly, or in bad faith.   Officer Kovach has presented no evidence to counter the implications created by these alleged facts.   Accordingly, Officer Kovach is not entitled to Summary Judgment on the issue of immunity from Ms. Gill's state claims for assault and battery.   However, if a jury does not find that his actions were malicious, wanton, reckless, or in bad faith,  he will be entitled to immunity from the assault and battery under state law.

> **C.**     **Claims Against Chief Mandopoulos and Mr. Franklin**

Ms. Gill also asserts state law claims against Chief Mandopoulos and Mr. Franklin in their individual capacities.  As city employees, they, too, are entitled to immunity for acts or omissions in connection with a governmental or proprietary function unless they acted outside the scope of their employment, with malicious purpose, in bad faith, in a wanton or reckless manner, or unless the Ohio Revised Code expressly imposes liability on them.  OHIO REV. CODE § 2744.03(A)(6)(a)-(c).  Ms. Gill has failed to establish that either Chief Mandopoulos or Mr. Franklin acted outside the scope of his employment, maliciously, in bad faith, wantonly, or recklessly.  Ms. Gill has merely asserted that they are liable because they ratified Officer Kovach's actions.  Consequently, Ms. Gill has failed to create a genuine issue of material fact.  Chief Mandopoulos and Mr. Franklin are entitled to immunity and summary judgment on all state law claims against them.

---

[13] Officer Kovach's Response to Resistance indicates that Ms. Gill hit or kicked him and kicked out the window of his police cruiser.  The City produced no record of a repair or replacement of the window when asked for such evidence during discovery; and, the video would seem to show that Ms. Gill never hit or kicked Officer Kovach  and that she did not break or kick out the window of his police car, although she admittedly kicked at the window.  Further, although Officer Kovach reported that Ms. Gill was arrested before he tasered her, there is contradictory evidence as to whether Officer Kovach had told Ms. Gill she was under arrest before she was tasered the first time.  It also bears noting that Chief Mandopoulos, in his investigation, found that Officer Kovach violated police policy by making inaccurate, false or improper statements with regard to the incident.

## CONCLUSION

For all of the reasons set forth above, the Summary Judgment motion of the City, Chief Mandopoulos, and Mr. Franklin (ECF #54) is GRANTED;  Officer Kovach's motion for summary judgment (ECF # 53) is GRANTED in part and DENIED in part; and, the Defendants' motions for summary judgment on the spoliation of evidence claims (ECF # 83, 86) are GRANTED.  Counts Two, Three, Five, and Seven of the First Amended Complaint are dismissed.  As to Count One, the claim for unlawful seizure or arrest under 42 U.S.C. § 1983 is dismissed, but the claim for excessive force against Officer Kovach will proceed to trial.  The state claim for assault and  battery under Ohio law (Count Four) will also proceed to trial.

IT IS SO ORDERED.


*Donald C. Nugent*
DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE


Date:  July 27, 2010